Robert STUART and Lin Farquhar-Stuart,
Plaintiffs-Respondents,

v.

WEISFLOG'S SHOWROOM GALLERY, INC.
and Ronald R. Weisflog,
Defendants-Respondents,

AMERICAN FAMILY MUTUAL INSURANCE COMPANY,
Defendant-Appellant-Petitioner.

Supreme Court of Wisconsin

*No. 2005AP1287. Oral argument September 5, 2007.
—Decided July 10, 2008.*

2008 WI 86

(Also reported in 753 N.W.2d 448.)

For the defendant-appellant-petitioner there were briefs by *Paul J. Pytlik, Michelle M. Stoeck,* and *Hills Legal Group, Ltd.,* Waukesha, and oral argument by *Paul J. Pytlik.*

For the plaintiffs-respondents there was a brief by *James J. Carrig, Matthew R. Jelenchick,* and *Niebler, Pyzyk, Klaver & Carrig LLP,* Menomonee Falls, and oral argument by *Matthew R. Jelenchick.*

An amicus curiae brief was filed by *Jeffrey Leavell* and *Jeffrey Leavell, S.C.,* Racine, on behalf of the Civil Trial Counsel of Wisconsin.

¶ 1. LOUIS B. BUTLER, JR., J. This is a review of a published court of appeals opinion[1] affirming the circuit court's determination that a commercial general liability (CGL) insurance policy issued by American Family Mutual Insurance Company (American Family) to Weisflog's Showroom Gallery, Inc. (WSGI)[2] covered damages awarded to Robert Stuart and Lin Farquhar-Stuart (the Stuarts) in a lawsuit resulting from the misrepresentations, as well as design and construction defects, related to a home remodeling project WSGI performed for the Stuarts.

---

[1] *Stuart v. Weisflog's Showroom Gallery, Inc.,* 2006 WI App 184, 296 Wis. 2d 249, 722 N.W.2d 766.

[2] Record exhibits include various documents that depict the name of the business as "Weisflog Homes," "Weisflog's Showroom Gallery, Inc.," "Weisflog Homes Specialty Drywalling & Repairs," and "Weisflog's Home and Remodeling Showroom." The Stuarts' "Remodeling Architectural Contract" was with Weisflog's Showroom Gallery, Inc., and the "Remodeling Contract" was with Weisflog Homes Specialty Drywall & Repairs. Except where it is necessary to differentiate, "WSGI" will refer to the business under all of its names.

497

¶ 2. A jury found WSGI liable for the statutory and tort violations alleged by the Stuarts, estimating damages "resulting from the negligence" of the defendants at $95,000. The Circuit Court for Waukesha County, Judge Patrick C. Haughney presiding, also required the jury to apportion the damages between the misrepresentation and negligence in construction claims. The court subsequently accorded statutory double damages and attorney fees to only the percentage of the award assigned to the misrepresentation claim.

¶ 3. The court of appeals reversed.[3] The damage award and related issues raised in that appeal are the subjects of the companion case, *Stuart v. Weisflog's Showroom Gallery, Inc.*, 2008 WI 22, 308 Wis. 2d 103, 746 N.W.2d 762 (*Stuart I*), which was released earlier this term.

¶ 4. The subject of the present opinion is a separate appeal by American Family, in which the insurance company asks us to determine whether WSGI's CGL insurance policy covers the damages awarded to the Stuarts.[4] We agree with American Family that the

---

[3] In a decision described in more detail in the background section of this opinion, the court of appeals held that the apportionment of damages between the misrepresentation and negligence and resulting limitation of double damages was erroneous, and that the attorney fees award was similarly erroneous, being based in part on the apportionment calculation. *Stuart v. Weisflog's Showroom Gallery, Inc.*, 2006 WI App 109, ¶¶ 5, 42–57, 293 Wis. 2d 668, 721 N.W.2d 127. The court of appeals also ruled in relevant part that the Stuarts' claims were not barred by the economic loss doctrine or any statute of limitations. *Id.*, ¶¶ 4, 19–34, 62.

[4] American Family also raises economic loss doctrine, damage apportionment and attorney fees arguments that we have resolved in *Stuart v. Weisflog's Showroom Gallery, Inc.*, 2008 WI

damages caused by Weisflog and WSGI in this case are not covered by the insurance policy because their misrepresentations were not accidental "occurrences" within the meaning of the policy, and because property damage arising out of their work is excluded from coverage. We therefore reverse the decision of the court of appeals and remand this matter for further proceedings consistent with this opinion and with *Stuart I*.

I

¶ 5. The facts of this case are identical to those set out in the companion case, *Stuart I*. Only those facts pertinent to the issues raised in this appeal will be repeated here.

¶ 6. In 1995 the Stuarts entered into a "Remodeling Architectural Contract" with WSGI for architectural drawings for a sizable home remodeling project.[5] The next year, the Stuarts entered a "Remodeling Contract" with "Weisflog Homes" to perform the construction work on the project, which included, among other things, expansion of the living room, family room, master bedroom and garage, and the addition of a bedroom and a hot tub/spa room, at a cost of approximately $278,000.[6]

22, 308 Wis. 2d 103, 746 N.W.2d 762 (*Stuart I*). Therefore, we do not address those issues further in this opinion. Although those issues were also discussed in the court of appeals decision which we review in the present opinion, the mandate of that decision was limited to the issue of insurance coverage, and consequently so is the mandate and ruling in this decision.

[5] The "Remodeling Architectural Contract" was signed by Ronald R. Weisflog, president, on behalf of WSGI.

[6] The "Remodeling Contract" was signed by Robert R. Weisflog, on behalf of Weisflog Homes.

¶ 7. WSGI completed construction in 1997. Four years later, the Stuarts discovered problems with the floor in the hot tub/spa room. An engineer/home inspector hired by the Stuarts found significant defects in the design and construction of the project, including rotted wood, warped windows, mold and mildew, inadequate ventilation, improper clearance to floor joists, exposed insulation, lack of access to attic and crawl spaces, drainage problems, improperly installed lighting, lack of rain gutters, improperly constructed stairs, and lack of hand rails. In 2003 the Stuarts brought suit against WSGI, Weisflog, and Employers Insurance of Wausau, alleging negligence. The action against Employers Insurance of Wausau was voluntarily dismissed on April 29, 2003, and an amended complaint filed the same day named American Family, with whom WSGI had a CGL policy, as a party to the suit. A second amended complaint was filed on August 11, 2003, alleging that WSGI and Weisflog engaged in misrepresentation in violation of the Home Improvement Trade Practices Act, codified as Wis. Admin. Code § ATCP 110 (Sept. 2001) and enforced through Wis. Stat. § 100.20(2005–06),[7] and

---

[7] The Stuarts' second amended complaint lists a number of provisions under Wis. Admin. Code § ATCP 110.02 and .05 (Sept. 2001), which they claim WSGI and Weisflog violated. Section ATCP 110.02(11) remains a focus in this appeal. The section provides in relevant part:

> Prohibited Trade Practices. No seller shall engage in the following unfair methods of competition or unfair trade practices:
>
> . . . .
>
> (11) Misrepresentations; general. Make any false, deceptive or misleading representation in order to induce any person to enter into a home improvement contract, to obtain or keep any payment under a home improvement contract, or to delay performance under a home improvement contract.

breach of contract,[8] while incorporating the negligence claims of the first amended complaint. The Stuarts sought double damages, pursuant to Wis. Stat. § 100.20(5).[9]

¶ 8. In its answer to the second amended complaint, American Family stated that the policy it issued "may not provide coverage" for the claims. In a motion filed on March 5, 2004, American Family asked the circuit court for a declaration that the Stuarts' claims and damages were not covered by the policies issued to Weisflog and WSGI, and requested that American Family be summarily dismissed from the case. In an order signed on June 22, 2004, the court determined that the homeowners' policies issued to Weisflog did not cover the damages, but the court denied the motion as to the CGL policy issued to WSGI. In a pretrial report, American Family again set forth its position that it had no responsibility to cover damages caused by WSGI.

¶ 9. In support of his misrepresentation claim, Robert Stuart testified at trial that Ronald Weisflog had made assurances that his products are high quality, that he understood local codes and regulations, and

All references to the Wisconsin Administrative Code are to the September 2001 register date unless otherwise noted. All subsequent references to the Wisconsin Statutes are to the 2005–06 version unless otherwise indicated.

[8] The breach of contract claims were voluntarily dismissed by the Stuarts at the opening of trial and are no longer at issue on appeal.

[9] Wisconsin Stat. § 100.20(5) provides:

Any person suffering pecuniary loss because of a violation by any other person of any order issued under this section may sue for damages therefor in any court of competent jurisdiction and shall recover twice the amount of such pecuniary loss, together with costs, including a reasonable attorney's fee.

that "he could provide architectural service for us where he would do all the architectural design work for us." In contrast with such assurances, the Stuarts highlighted not just the undisputedly poor quality of the product and services they received, but also the statements of both Ronald and Robert Weisflog admitting unfamiliarity with the building code.[10]

---

[10] In particular, Robert Weisflog testified that he did not even know there was a Brookfield code. In contrast with Robert Stuart's testimony, his father, Ronald Weisflog, testified that he did not recall telling the Stuarts he would comply with the building code, and he refused to concede that he was completely unfamiliar with the codes. During cross-examination, Ronald answered the question, "Well, isn't the truth that you didn't know what the codes were?" with the flat denial, "no." However, Ronald soon afterwards conceded unfamiliarity with part of the code pertinent to this case. In response to the question, "But, in fact, you did not know what the building code was for exhausting dryer vents, fair statement?" Ronald answered, "That's fair."

Justice Roggensack's concurring opinion describes our reference to such statements in the record as inappropriate references because, she contends, we may not refer to facts in the record beyond the words of the jury's special verdict answers to support our opinion. Justice Roggensack's concurrence, ¶ 100. However, this limited approach to appellate review is not supported by legal authority. It is well established that upon reviewing a jury's special verdict answers or other findings, we may refer to whatever facts in the record support the jury's findings. *See Coney v. Milwaukee & Suburban Transp. Corp.,* 8 Wis. 2d 520, 528, 99 N.W.2d 713 (1959); *Huffman v. Reinke,* 268 Wis. 489, 490, 67 N.W.2d 871 (1955). Similarly, we may turn to supporting documents in the record to interpret a jury's findings. *See U.S. v. Bass,* 327 F. Supp. 959, 960 (E.D. Wis. 1971). Here, the jury answered "yes" to Special Verdict Question #1, which asked whether Weisflog Showroom Gallery, Inc. made "*any* false, deceptive, or misleading representations in order to induce the Plaintiffs, Robert & Lin Stuart to enter into a remodeling architecture contract, or to obtain or keep any payment under the remodeling

¶ 10. On October 6, 2004, a jury found that WSGI did make false, deceptive or misleading representations in order to induce the Stuarts to enter into a remodeling architecture contract, that the Stuarts relied on those representations, and that those representations were a cause of damages to the Stuarts. The jury further found WSGI negligent in the design of the remodeling project, and that such negligence was a cause of damages to the Stuarts. The jury also found WSGI negligent with respect to the construction of the addition to the Stuarts' home, and that such negligence was a cause of damage to the Stuarts. Finally, the jury found that WSGI made false, deceptive or misleading representations that remodeling work would comply with building codes in order to induce the Stuarts to enter the remodeling contract, that the Stuarts relied on those representations, and that those representations were a cause of damage to the Stuarts.

¶ 11. The jury held WSGI liable for $95,000 in damages "resulting from the negligence" to the Stuarts. In accordance with the special verdict instructions, the jury then apportioned the damages between the mis-

contract" (emphasis added). Contrary to Justice Roggensack's representation of this question, it did not use the same wording of the later Special Verdict Question #13, which limited its inquiry to representations about future compliance with building codes, but rather asks about "*any*" misrepresentations. Because Question #1 is comparatively broad and not limited to specific misrepresentations, it is appropriate to turn to the record to review what evidence of misrepresentations was presented to the jury. Indeed, in her dissent to *Stuart I,* Justice Roggensack herself cites the record, and not just the special verdict, where it supports her argument to do so. *See Stuart I,* 308 Wis. 2d 103, ¶¶ 88–89 (Roggensack, J., dissenting)(referring to testimony of an expert witness to argue that such testimony provided the support for the jury's damage award for negligent construction).

503

representation and negligence claims, allocating 25 percent of the award to violations of Wis. Admin. Code ch. ATCP 110 and 75 percent to negligence in construction.

¶ 12. In a post-verdict motion filed on October 27, 2004, American Family requested an order ruling that WSGI's CGL policy excluded coverage for the damages awarded to the Stuarts; dismissing the portion of damages related to misrepresentations because, American Family argued, the statute of limitations had expired; and dismissing the portion of damages related to negligence because, American Family argued, those claims were barred by the economic loss doctrine. The motion also requested that, in the alternative, a new trial be conducted to apportion those damages covered by insurance from those which are not.

¶ 13. In an order dated January 10, 2005, the circuit court denied the motion and concluded that insurance coverage existed under the CGL policy for the damages awarded. On February 10, 2005, judgment was entered against WSGI and American Family in the amount of $154,108. The award included the $95,000 awarded by the jury, in addition to double damages in the amount of $23,750 for the misrepresentation portion of the award, attorney fees of $15,675, and costs in the amount of $19,683.

¶ 14. The Stuarts filed an appeal on April 6, 2005; Weisflog and WSGI filed a cross-appeal. On May 9, 2005, American Family also filed a cross-appeal, which was subsequently designated a new appeal and given a separate case number.

¶ 15. On May 3, 2006, the court of appeals decided the Stuarts' appeal and Weisflog's and WSGI's cross-appeal. In *Stuart v. Weisflog's Showroom Gallery, Inc.*, 2006 WI App 109, 293 Wis. 2d 668, 721 N.W.2d 127, the

court of appeals affirmed the circuit court's decision that the Stuarts' lawsuit was not barred by the statute of limitations and that the economic loss doctrine did not apply. *Id.*, ¶¶ 4, 19–34. However, the court of appeals reversed the circuit court's decision to double only a portion of the award, and it remanded the matter for entry of judgment reflecting a doubling of the entire damage award and for redetermination of attorney fees. *Id.*, ¶¶ 5, 42–57. The court of appeals also held that the circuit court erred in excluding a question as to Ronald Weisflog's personal liability from the verdict form, and remanded the matter for a retrial on that limited question. *Id.*, ¶¶ 58–62. WSGI, Weisflog, and American Family petitioned this court for review, and review was granted on December 6, 2006.[11]

¶ 16. The court of appeals decided American Family's separate cross-appeal in *Stuart v. Weisflog's Showroom Gallery, Inc.*, 2006 WI App 184, 296 Wis. 2d 249, 722 N.W.2d 766, affirming the circuit court's determination that the American Family policy covers the Stuarts' damage award. Specifically, the court of appeals concluded that the general coverage provisions of the CGL policy do not exclude ATCP misrepresentation violations, because even though an "occurrence" is defined as "accidental" under the policy, the ATCP misrepresentation cause of action does not require proof of intent to deceive. *Id.*, ¶¶ 1, 23–33. The court concluded that other damages would also be covered under the main coverage clause because "all the damages awards here flowed from the defendant's liability for property damage, in that but for the misrepresentations, the latter would not have occurred." *See id.*, ¶ 38. Finally,

---

[11] Additional facts and procedural background are set forth in *Stuart I,* 308 Wis. 2d 103, ¶¶ 1–9.

the court concluded that neither the "your work" nor the "your product" business risk exclusion in the CGL policy cited by American Family applies. *Id.*, ¶¶ 1, 17–22, 38. American Family petitioned this court for review, and review was granted on December 6, 2006.

¶ 17. In our separate *Stuart I* opinion, we affirmed the court of appeals decision remanding on the bases that the circuit court should not have required the jury to apportion damages between misrepresentation and negligence, that the attorney fees calculation erroneously failed to apply the correct rule of law, that neither the economic loss doctrine nor any statutes of limitations bars the negligence claims in this case, and that there remain unresolved issues regarding the personal liability of Ronald Weisflog. *See Stuart I,* 308 Wis. 2d 103, ¶¶ 4, 48. We now address the remaining insurance coverage issues, concluding for the below reasons that the damages caused by Weisflog and WSGI in this case are not covered by the CGL insurance policy issued by American Family.[12]

## II

¶ 18. This case primarily involves interpretation of an insurance policy, which is ordinarily a question of law subject to de novo review. *See Welin v. Am. Family Mut. Ins. Co.,* 2006 WI 81, ¶ 16, 292 Wis. 2d 73, 717 N.W.2d 690. An insurance policy's terms should be interpreted as they would be understood by a reason-

---

[12] Because we have already explained in *Stuart I,* 308 Wis. 2d 103, ¶¶ 13–37, the reasons why the economic loss doctrine does not bar the Stuarts' claims, we do not here address Justice Roggensack's arguments related to that issue which she raises in her separate opinions both to this case and to *Stuart I.*

able person in the position of the insured. *State Farm Mut. Auto. Ins. Co. v. Langridge,* 2004 WI 113, ¶ 47, 275 Wis. 2d 35, 683 N.W.2d 75. We will interpret a policy's language so that it comports with the common and ordinary meaning it would have in the mind of a lay person. *Cieslewicz v. Mut. Serv. Cas. Ins. Co.,* 84 Wis. 2d 91, 97–98, 267 N.W.2d 595 (1978).

¶ 19. If an insurance policy's language is ambiguous, i.e., susceptible of more than one reasonable interpretation, we will construe it in favor of coverage. *Cardinal v. Leader Nat'l Ins. Co.,* 166 Wis. 2d 375, 382, 480 N.W.2d 1 (1992). Similarly, exclusions to insurance coverage are narrowly construed against the insurer, especially if their effect is uncertain. *Id.*

¶ 20. If, however, the language of a policy is unambiguous, and its terms plain on their face,

> the policy should not be rewritten by construction to bind the insurer to a risk it was unwilling to cover, and for which it was not paid. Litigants should not be able to resort to rules of construction for the purpose of modifying the contract or creating a new contract; and a court need not resort to either construction or case law to bolster its recognition of that plain meaning.

*Garriguenc v. Love,* 67 Wis. 2d 130, 135, 226 N.W.2d 414 (1975). An otherwise unambiguous provision is not rendered ambiguous solely because it is difficult to apply the provision to the facts of a particular case. *Lawver v. Boling,* 71 Wis. 2d 408, 422, 238 N.W.2d 514 (1976).

### III

¶ 21. This case requires us to determine whether the CGL policy issued by American Family to WSGI

contains coverage for the damages awarded to the Stuarts. As a threshold matter, we must first determine whether the main coverage clause of the policy includes coverage for the damages, or whether, as American Family argues, coverage is precluded because the misrepresentations in this case were not "accidents." We then address American Family's other arguments, including whether coverage is precluded because WSGI caused only economic damages, not property damage, and whether the policy's business risk exclusion clauses invoked by American Family apply.

A

¶ 22. We begin our examination of the coverage issue by reviewing the language of the "bodily injury and property damage liability" coverage clause of the CGL policy. The coverage clause provides in relevant part:

COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. . . .

. . . .

b. This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

(2) The "bodily injury" or "property damage" occurs during the policy period.

508

The policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

■

¶ 23. Relying on this language limiting coverage to accidental occurrences, American Family argues that misrepresentation violations under Wis. Admin. Code § ATCP 110.02 are by definition intentional, and thus do not constitute accidental occurrences. We agree for the below reasons that ATCP § 110 misrepresentations do not constitute "accidents" triggering coverage.

■

¶ 24. The plain text of the American Family CGL policy unambiguously defines "occurrence" as an "accident." The meaning of "accident" itself is similarly unambiguous; we need look no farther than the common and ordinary meaning of the word as understood by a lay person. *See Cieslewicz,* 84 Wis. 2d at 97–98. To determine the common and ordinary meaning of a word, we often rely upon definitions from recognized dictionaries. *See, e.g., State v. Polashek,* 2002 WI 74, ¶ 19, 253 Wis. 2d 527, 646 N.W.2d 330. *Webster's Third New International Dictionary* defines an accident as "1.a. an event or condition occurring by chance or arising from unknown or remote causes . . . b. *lack of intention* or necessity . . ." (emphasis added). *Webster's Third New International Dictionary* 11 (3d ed. 1986). Therefore, applying the common and ordinary meaning that "accident" would have in the mind of a lay person, we conclude that an accident is an event or condition occurring by chance or one that arises from unknown causes, and is unforeseen and unintended.[13]

---

[13] A similar dictionary definition of "accident" was cited in *Doyle v. Engelke,* 219 Wis. 2d 277, 289, 580 N.W.2d 245

¶ 25. The parties do not appear to dispute whether an accident is, by definition, an unintentional act. Rather, the focus of their dispute is whether an ATCP misrepresentation is an unintentional act, thereby rendering it an accident.

¶ 26. American Family argues that the language of Wis. Admin. Code § ATCP 110.02(11) clearly indicates that intent is an element of the statutory misrepresentation violation, with the code section providing that a seller may not make a false representation "in order to" obtain a contract, obtain any payment, or delay performance. In support of this argument, American Family cites *Everson v. Lorenz,* 2005 WI 51, 280 Wis. 2d 1, 695 N.W.2d 298, in which this court concluded that misrepresentations are not "accidents" within the context of a similar CGL policy. American Family urges us to follow *Everson* and come to the same conclusion in this case, explaining that "[m]aking representations with an intent to induce the signing of a contract involves a purposeful intent which is inherently inconsistent with the concept of an [accidental] 'occurrence.' "

¶ 27. We agree with American Family that the ATCP misrepresentations in this case were not accidental occurrences, and that *Everson* controls.

¶ 28. The Stuarts do not take issue with the jury's findings that WSGI made misrepresentations "in order to induce" the Stuarts to enter into the architecture or remodeling contract. Applying a common and ordinary interpretation of the "in order to" language of the code and special verdict in this case, we conclude that this language evinces a clear element of volition. With the

(1998)(" 'accident' is defined as '[a]n unexpected, undesirable event' or 'an unforeseen incident' which is characterized by a 'lack of intention' ")(quoting *The American Heritage Dictionary of the English Language* 11 (3d ed. 1992)).

jury having found the presence of such volition and intent, in accordance with the requirements of the code, the only reasonable conclusion regarding WSGI's conduct "in order to induce" is that such conduct cannot qualify as an accidental, i.e., unintentional, occurrence.

¶ 29. In support of this conclusion, we turn to *Everson,* which involved a similar insurance interpretation question. In that case, Everson, the plaintiff, brought negligent, strict liability, and intentional misrepresentation claims against Lorenz after Lorenz misrepresented that the property he sold Everson was not within a flood plain. *Everson,* 280 Wis. 2d 1, ¶¶ 4–5, 13. As a result of the misrepresentation, Everson purchased land which was unsuited for the construction of the home he had intended to build on it. *Id.*

¶ 30. Among the questions the court of appeals certified to this court in *Everson* was the issue of "[whether] an alleged strict responsibility misrepresentation and/or negligent misrepresentation in a real estate transaction constitute an 'occurrence' for the purpose of a commercial general liability insurance policy such that the insurer's duty to defend the insured is triggered[.]" *Id.*, ¶ 2. In *Everson,* we concluded that no coverage existed under the CGL policy, which defined "occurrence" in the same manner as the CGL policy in the present case. *See id.*, ¶¶ 12, 41. The basis for our decision that the CGL policy did not provide coverage was our conclusion that a volitional misrepresentation could not be considered an accident for purposes of coverage. *Id.*, ¶¶ 18–20.

¶ 31. *Everson* is directly applicable to this case, particularly in light of the fact that both cases require us to address whether misrepresentations are covered under a CGL policy that limits coverage to accidental occurrences. In the present case, the jury found that

WSGI made misrepresentations in order to induce the Stuarts into the remodeling architectural contract and the remodeling contract. In addition, Ronald Weisflog knew at the time of the misrepresentations that he was not familiar with an applicable building code.[14] *Stuart,* 296 Wis. 2d 249, ¶ 3.

¶ 32. Such evidence illustrates that WSGI's conduct was a volitional act, as opposed to an accidental occurrence. In *Everson,* we concluded that a false assertion "requires a degree of volition inconsistent with the term accident," and we held that "where there is a volitional act involved in such a misrepresentation, that act removes it from coverage as an 'occurrence' under the liability insurance policy." *Everson,* 280 Wis. 2d 1, ¶¶ 19–20. The same principle applies here. WSGI's false assertions to the Stuarts reflect a similar degree of volition, rendering the misrepresentations, along with the damage they caused, inapplicable for coverage as an accidental occurrence.

¶ 33. The Stuarts attempt to distinguish this court's ruling in *Everson* as limited to negligent or strict liability misrepresentation claims. They argue that the ruling does not preclude CGL policy coverage for damages resulting from misrepresentations under Wis. Admin. Code § ATCP 110, which they argue can still be considered accidental occurrences. The difference, the Stuarts contend, is that statutory misrepresentation claims under § ATCP 110 do not require the same degree of knowledge or intent as negligent or strict liability misrepresentation claims.

¶ 34. We reject this argument. It defies logic to suggest that an ATCP misrepresentation claim, which

---

[14] *See* supra, ¶ 9 n. 10.

includes a volitional "in order to induce" element, does not "rise to the level of common law misrepresentations," as the Stuarts argue. The Stuarts' argument is tied to their claim that, unlike common law misrepresentation claims, a Wis. Stat. § 100.18 misrepresentation claim does not include an element of "intent to deceive or knowledge of falsity."[15] However, proof of intent or knowledge of falsity is not required in either *strict liability* or negligent misrepresentation claims. *See Kailin v. Armstrong,* 2002 WI App 70, ¶ 40 n.23, 252 Wis. 2d 676, 643 N.W.2d 132.

¶ 35. Indeed, *Kailin,* upon which the Stuarts rely, provides a helpful guide to the different types of misrepresentation claims, explaining that proof of intent to defraud is required for an intentional misrepresentation claim, while strict liability and negligent misrepresentation claims do not include actual intent elements at all. *See id.,* ¶ 37 & n.22, ¶ 40 & n.23. In contrast, § ATCP 110 and Wis. Stat. § 100.18 misrepresentation claims do indeed require proof of intent to sell or induce. As such, not only is the act in this case clearly volitional in nature, but the Stuarts' attempt to distinguish *Everson* on the basis that this case involves a misrepresentation claim fails.

---

[15] The Stuarts appear to cite § ATCP 110 and Wis. Stat. § 100.18 interchangeably in their discussion about the difference between statutory and common law claims because, as Wisconsin courts have recognized, "public policy dictates that consumer protection statutes and administrative rules must be read in pari materia to achieve the goal of providing protection and remedies to consumers." *Rayner v. Reeves Custom Builders, Inc.,* 2004 WI App 231, 277 Wis. 2d 535, 691 N.W.2d 705. Those cases interpreting Wis. Stat. § 100.18 are pertinent to our § ATCP 110 analysis, particularly in light of the fact that statutes contain "intent to induce" language that is the focus of our volition discussion.

¶ 36. Not only is the Stuarts' proposed approach unreasonable, but it is also inappropriate in its failure to abide by the longstanding rule that we "must focus on the incident or injury that gives rise to the claim, not the plaintiff's theory of liability." *Berg v. Schultz,* 190 Wis. 2d 170, 177, 526 N.W.2d 781 (Ct. App. 1994). In *Berg,* the court of appeals explained that this rule applies specifically to insurance coverage issues as well as to other situations. *Id.* (citing *Bankert v. Threshermen's Mut. Ins. Co.,* 110 Wis. 2d 469, 480, 329 N.W.2d 150 (1983)). Most pertinently, this court held in *Bankert* that:

> we need not speculate as to what was intended by the company when it issued the policy or by the insured when he acquired it. As pointed out above, the company becomes legally liable to pay only when the insured incurs liability for personal injury or property damage caused by an "occurrence." *An occurrence is defined as an accident. This is what is insured against—not theories of liability.*

*Bankert,* 110 Wis. 2d at 480 (emphasis added).

¶ 37. Applying these principles to the arguments made by the Stuarts in this case, we conclude that the Stuarts place undue and inappropriate emphasis on the relative mens rea requirements of various misrepresentation causes of action. To determine whether an act is accidental within the meaning of the CGL policy in this case, we need only determine whether the occurrence giving rise to the claims[16] was an unintentional act in the sense that it was not volitional.

¶ 38. Even if it were appropriate for us to distinguish among various types of misrepresentation claims,

---

[16] *See Am. Family Mut. Ins. Co. v. Am. Girl,* 2004 WI 2, ¶ 37, 268 Wis. 2d 16, 673 N.W.2d 65.

*Kailin* provides us the guidance we need to determine that ATCP misrepresentation claims are at least as intentional in nature as negligent or strict liability misrepresentation claims. *See Kailin,* 252 Wis. 2d 676, ¶ 37 & n.22, ¶ 40 & n.23. Consequently, the *Everson* holding that common law misrepresentation claims are not "accidental" in nature logically applies to ATCP misrepresentation cases as well.

¶ 39. The Stuarts' other attempts to distinguish *Everson* as inapplicable to Wis. Admin. Code § ATCP 110 claims are fundamentally fallacious as well. The Stuarts further argue, for instance, that, unlike the misrepresentation in *Everson,* WSGI's representations became false only after the design and construction of the home addition were completed. The Stuarts contend that an infringer's knowledge is "absolutely irrelevant" because, under § ATCP 110, a representation may later ripen to a falsehood upon subsequent non-performance, as in this case.

¶ 40. The Stuarts have it backwards. As we have explained, the ordinary meaning of the word "accident," as used in accident insurance policies, is "an event which takes place without one's foresight or expectation. A result, though unexpected, is not an accident"; rather, it is the causal event that must be accidental for the event to be an accidental occurrence. *See Am. Family Mut. Ins. Co. v. Am. Girl, Inc.,* 2004 WI 2, ¶ 37, 268 Wis. 2d 16, 673 N.W.2d 65 (citation omitted). *See also Doyle,* 219 Wis. 2d at 290 (The definitions of both negligence and accident "center on an unintentional occurrence leading to undesirable results. . . . [C]omprehensive general liability policies are 'designed to protect an insured against liability for negligent acts resulting in damage to third-parties.' ")(citations omitted); *United Coop. v. Frontiers*

*FS Coop.*, 2007 WI App 197, ¶ 13, 304 Wis. 2d 750, 738 N.W.2d 578, (describing the determinate factor for coverage as the event that caused the damage, i.e., the "causal 'occurrence' "). In this case, the jury found (and ensuing court opinions, including *Stuart I*, clarified) that the property damage arose from the misrepresentations made in order to induce the Stuarts to enter into the contracts with WSGI. It does not matter whether WSGI intended a specific result; what matters is whether the cause of the damage was accidental. Consequently, contrary to the Stuarts' arguments, the defendants' intent to induce at the time they engaged in misrepresentations, not their ability to predict the exact result of their actions, is the key to determining whether their conduct was accidental.

¶ 41. The Stuarts' attempt to distinguish *Everson* by arguing that WSGI's representations became false only after the job performance had ended depends upon a condition not supported by the record: that the only misrepresentations by WSGI were assurances regarding future performance, as opposed to misrepresentations about existing conditions. In fact, the record shows that the Stuarts themselves alleged, argued to the jury, and produced supporting evidence that Weisflog made misrepresentations on behalf of WSGI about his then existing qualifications, knowledge, and abilities, not just about future performance. For example, Robert Stuart's testimony describes Ronald Weisflog's statements during their first meeting in the following terms:

> [H]e professed a very high standard of quality, and he felt he could deliver exactly what we wanted. And he talked about his qualities. *He understood Brookfield codes and regulations very well* [emphasis added]. That process would be easy. He could provide architectural

service for us where he would do all the architectural design work for us. . . .

These statements constitute a representation of Weisflog's knowledge and WSGI's abilities at the time the statements were made, rather than merely being promises of future performance.

¶ 42. As such, with the Stuarts basing their ATCP claims in *Stuart I* largely on misrepresentations about the defendants' already existing abilities, skills, and past work, the Stuarts have refuted their own argument in this case that the only "misrepresentations" made were promises of future actions, which Weisflog could not have known were "false" until after WSGI's performance.

¶ 43. The final "occurrence" argument by the Stuarts we address is their contention that the CGL policy's property damage coverage clause must include coverage for misrepresentation claims because the policy's business risk exclusions specifically refer to "warranties or representations." The Stuarts cite this court's decision in *American Girl* in support of their argument that if a misrepresentation were not an occurrence, there would be no need for the policy's exclusions to expressly include representations. However, the *American Girl* passage cited by the Stuarts did not address misrepresentations. Rather, in that passage, we were rejecting American Family's contention that losses actionable in contract could never be CGL "occurrences," pointing to business risk exclusions applicable to contractual relationships as indicative that in some cases actions in contract could be occurrences.

¶ 44. The same logic does not necessarily extend to an analysis of whether a CGL policy which does not

include misrepresentations among those "occurrences" generally entitled to coverage could still reference *other* representations in a "your work" exclusion. In other words, the reference to certain types of representations in the description of a business risk exclusion does not necessarily include reference to misrepresentations specifically. "Misrepresentations" are but a subset of "representations." Under the plain text of the "products-completed operations hazard" "your work" exclusion in the CGL policy, so long as a person made a representation that caused property damage away from the owned or rented premises of the person making the representation after the work was completed, the exclusion would apply. The representation is not required under that exclusion to be false, let alone a misrepresentation accompanied by the type of volition described in *Everson*.[17]

¶ 45. · In sum, each of the Stuarts' attempts to paint WSGI's misrepresentations as accidental occurrences fail. Neither case law nor common sense supports an interpretation of "accidental occurrence" that would include misrepresentations volitionally made with the particular intent to induce. The CGL policy unambiguously limits coverage to accidental occurrences. Therefore, we cannot reasonably view the misrepresentations in this case as occurrences within the meaning of the CGL policy.

## B

¶ 46. Having concluded that WSGI's misrepresentations are not the type of occurrence covered by the

---

[17] Our holding today does not, however, resolve the question of whether an "occurrence" in a future case could involve an accidental misrepresentation, in which a person may have misspoken.

CGL policy, we must nevertheless address three issues raised by American Family's remaining arguments: (1) whether the policy also fails to include coverage because the damages in this case were economic, not property, damages; (2) whether, even if coverage generally existed, the "your product" business risk exclusion in the policy would apply; and (3) if not, whether the "your work" business risk exclusion would apply.

¶ 47. The reason we do so is because the Stuarts raise an argument in this appeal that broadens the scope of the issues beyond just the misrepresentation claim. The Stuarts argue that even if Wis. Admin. Code § ATCP 110 violations do not constitute an "occurrence," the rule of concurrent risks could still compel coverage due to the negligence claims in this case, citing *Lawver,* 71 Wis. 2d 408, and *Varda v. Acuity,* 2005 WI App 167, 284 Wis. 2d 552, 702 N.W.2d 65.

¶ 48. In *Lawver,* this court ruled that an insurance company "should not be excused from its obligation to defend the action or pay benefits until it has been determined that the injuries did not result, even in part, from a risk for which it provided coverage and collected a premium." *Lawver,* 71 Wis. 2d at 422. In *Varda,* the court of appeals similarly described the rule of concurrent risks in the following manner:

> When an insurance policy expressly insures against loss caused by one risk, but excludes loss caused by another risk, coverage is extended to a loss caused by the insured risk even though the excluded risk is a contributory cause. An independent concurrent cause must provide the basis for a claim in and of itself, and must not require the occurrence of the excluded risk to make it actionable.

*Varda,* 284 Wis. 2d 552, ¶ 24 (citations omitted).

¶ 49. Applying these precedents, the Stuarts argue that in the present case, the jury determined that

the Stuarts' loss was caused by multiple concurrent risks involving not just Wis. Admin. Code § ATCP 110 misrepresentations, but also negligence.[18] As a result, the Stuarts argue, the damages in this case are still covered, despite the lack of coverage for misrepresentations, because the damages also arose out of the defendants' negligent actions.

¶ 50. We also acknowledge that during oral arguments, WSGI's attorney asked us to consider two different things which might be considered "occurrences" within the meaning of the policy: the misrepresentations, and the physical damage (the "rot and mold") to the Stuarts' house. American Family also appeared to concede during oral arguments there could be residual insurance coverage issues arising from the negligence claims even if we resolved that there was no coverage for misrepresentations.

¶ 51. Therefore, although we concluded in *Stuart I* that neither the evidence in the record nor legal authority supports separating the statutory and negligence claims for purposes of damage apportionment, *see Stuart I,* 308 Wis. 2d 103, ¶¶ 25–31, there may be justification for treating the two types of claims sepa-

---

[18] Only the Stuarts, not American Family, mention negligence in reference to insurance coverage. In contrast, American Family's arguments are focused on the damages flowing from the statutory misrepresentations in this case, and do not address separately the issue of whether coverage would apply to negligence as well. It appears from their briefs that American Family declined to address the applicability of the policy's main property damage coverage clause to damages arising out of negligent acts because they assumed that the Stuarts' negligence claims would otherwise be barred under the statute of limitations or economic loss doctrine. As we explained in *Stuart I,* however, that assumption is not true. *Stuart I,* 308 Wis. 2d 103, ¶¶ 15–19, 32–37.

rately in this appeal for the limited purpose of addressing the remaining insurance coverage issues. Because the occurrence in this case could be described either solely in terms of misrepresentations, or more broadly, to include WSGI's negligence in the relevant chain of events, we assume that the rule of concurrent risks might enable coverage due to the existence of negligence, notwithstanding the fact that the misrepresentations viewed in isolation were not covered. Because the rule of concurrent risks and the continuing presence of negligence in this case may re-open the door of potential coverage, we assume that coverage could exist, or be excluded, on other grounds.

1

¶ 52. We first address American Family's argument that the damages in this case are economic damages, not property damage, and therefore do not trigger coverage under the CGL policy. We agree with the Stuarts that the damages in this case clearly correspond with the approximately $95,000 awarded by the jury, which in turn corresponded with the cost to remedy the property damage to their home.

¶ 53. In support, American Family cites several cases, including *Smith v. Katz,* 226 Wis. 2d 798, 816–17, 595 N.W.2d 345 (1999); *Benjamin v. Dohm,* 189 Wis. 2d 352, 360–61, 525 N.W.2d 371 (Ct. App. 1994); and *Qualman v. Bruckmoser,* 163 Wis. 2d 361, 366, 471 N.W.2d 282 (Ct. App. 1991), but American Family fails to explain the applicability of these cases, which involve "difference in value" damages as awarded to remedy failure to disclose *preexisting* defects in property sales. *Id.* In this case, in contrast, the Stuarts were awarded

compensation for the damage to their property that came after, and was caused by, the defendants' statutory misrepresentation and common law negligence. Unlike this case, the plaintiffs in the cases cited by American Family did not allege any property damage caused by the defendants. *See Katz*, 226 Wis. 2d at 817; *Benjamin*, 189 Wis. 2d at 361–62; *Qualman*, 163 Wis. 2d at 366.

¶ 54. Furthermore, contrary to American Family's apparent interpretation of *Katz* as labeling all misrepresentation-related damages as economic damages, not property damages, we explicitly stated in *Katz* that we were not making such a sweeping conclusion:

> We are not saying that strict responsibility misrepresentations or negligent misrepresentations can *never* cause "property damage" as defined in the policies, particularly when "property damage" can include "loss of use of tangible property that is not physically injured." But we recognize that the majority view in the cases is that misrepresentations and omissions do not produce "property damage" as defined in insurance policies. They produce economic damage.

> Given this well established law, a complaint claiming strict responsibility misrepresentation or negligent misrepresentation must contain some statement about physical injury to tangible property, some reference to loss of use, or some demand for relief beyond money damages if the complaint is to satisfy the requirement that "property damage" be alleged within the four corners of the complaint.

*Katz*, 226 Wis. 2d 798, 816–17 (citations omitted). In this case, the Stuarts' complaints clearly alleged property damage arising out of WSGI's misrepresentations and negligence, which falls within the parameters of *Katz*.

¶ 55. Because we reject American Family's argument that the damages in this case were economic

damages, rather than property damages, we will address the potential application of the business risk exclusions invoked by American Family. If either applies, American Family would be exempt from covering the damages arising out of the negligence claims of the Stuarts. For the below reasons, we conclude that the "your work" exclusion, but not the "your product" exclusion, applies to bar coverage.

2

¶ 56. We next address American Family's argument that the "your product" business risk exclusion in WSGI's CGL policy bars coverage. The "your product" exception in the policy provides that the policy does not apply to " 'property damage' to 'your product arising out of it or any part of it.' " The policy defines "your product" as "[a]ny goods or product, *other than real property,* manufactured, sold, handled, distributed, or disposed of by: (1) You; (2) Others trading under your name; or (3) A person or organization whose business or assets you have acquired . . ." (emphasis added).

¶ 57. The Stuarts argue that the CGL policy's "your product" exclusion does not apply here. Specifically, they argue that the plain text of the policy's "your product" definition explicitly omits services and real estate, thus allowing coverage in this case. The Stuarts explain that the addition to their house is real property, rendering the "your product" exclusion inapplicable by its terms. We agree.

¶ 58. A plain language interpretation of the "real property" exception to the "your product" exclusion results in no other reasonable conclusion than that the Stuarts' home addition is "real property." *Black's Law*

*Dictionary* defines "real property" as "[l]and and anything growing on, attached to, or erected on it, excluding anything that may be severed without injury to the land." *Black's Law Dictionary* 1254 (8th ed. 2004). Wisconsin Stat. § 990.01 defines real property synonymously with real estate, providing: "Real estate or real property. 'Real estate' or 'real property' includes lands, tenements and hereditaments and all rights thereto and interests therein." Wis. Stat. § 990.01(35).[19] The Stuarts' home addition clearly falls within these definitions, and therefore qualifies as "real property," not subject to the "your product" exclusion.

¶ 59. American Family argues that the court of appeals' rejection of the "your product" exclusion is contrary to other decisions in which, American Family claims, Wisconsin courts have held that remodeling or home construction projects fall within a CGL policy's "your product" exception. However, the cases American Family cites are inapposite; only one of them described a CGL policy with a "your product" exception matching the one in the present case, i.e., having a "real property" exception, and in that case, *Nu-Pak, Inc. v. Wine Specialties International, Ltd.,* 2002 WI App 92, 253 Wis. 2d 825, 643 N.W.2d 848, the real property exception was not at issue. American Family therefore fails to meet its burden of establishing the applicability of the "your product" exclusion in the face of the obviously applicable "real property" exception to that exclusion.

---

[19] *See also Pulsfus Poultry Farms, Inc. v. Town of Leeds,* 149 Wis. 2d 797, 810, 440 N.W.2d 329 (1989)(In the context of tax exemptions, "[t]he statutes have defined real property as 'the land itself and all buildings and improvements thereon together with all fixtures and rights and privileges appertaining thereto.' ")(citation omitted).

¶ 60. Finally, we address American Family's argument that the damages in this case "are not covered by a CGL policy which excludes coverage for 'your work' and which defines 'your work' to include representations about the quality of the work." In particular, American Family argues that the following exclusion applies, denying insurance coverage for

1. Damage to Your Work

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

¶ 61. We agree that this exclusion is applicable, but observe that American Family failed to complete its argument explaining *why* it is applicable. In order to see how the exclusion American Family cites applies to damage arising out of WSGI's negligence, it is necessary to look at the policy's definition of "products-completed operations hazard":

"Products-completed operations hazard" includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned.

¶ 62. It is clear from the terms of the main exclusion (1) clause, read together with this definition,

that this "your work" exclusion applies to this case, in which property damage arose out of WSGI's negligence and misrepresentations, the damage did not occur on WSGI's own property, and the work was completed at the time the damages arose.

¶ 63. The words of the policy are not ambiguous: the CGL's "products-completed operations hazard" "your work" exclusion applies to property damage arising out of "your work," where that work occurs away from the premises owned or rented by the person doing the work, and where the work was completed at the time of the damage. "Your work" is defined as including "work or operations performed by you or on your behalf." Such a description is clearly applicable to WSGI's negligent design and construction of the home remodeling project, which caused property damage, did not occur on WSGI's own property, and was completed at the time the damages arose.

¶ 64. As to the subcontractor exception, the Stuarts do not contend that the subcontractors committed the "misrepresentations" at all, which are the focus of American Family's "your work" exclusion argument, and from which, as we explained in *Stuart I,* the negligent work flowed in this case. We agree with the court of appeals that this issue is nongermane, as no subcontractors were involved with the initial design other than to implement the design by doing the construction. *See Stuart,* 296 Wis. 2d 249, ¶ 21 n. 5.

¶ 65. Furthermore, as this court previously noted in *American Girl,* cases in Wisconsin and other jurisdictions have consistently recognized that under this provision of the policy, the "your work" exclusion does not apply to "damage *caused* to construction projects *by subcontractor negligence." Id.,* 268 Wis. 2d 16, ¶ 69 (emphasis added). *See also Kalchthaler v. Keller Const.*

*Co.,* 224 Wis. 2d 387, 391, 591 N.W.2d 169 (Ct. App. 1999)("The only reasonable reading of this exception is that it restores coverage to completed work caused by the work of a subcontractor."). In this action, the subcontractors performed at the direction and under the supervision of WSGI. Absent a showing of independent subcontractor negligence, the subcontractor exception to the "your work" exclusion is simply not applicable here.

¶ 66. For the above reasons, we conclude that even if coverage might otherwise apply to the negligence claims in this case, the "your work" business risk exclusion cited by American Family would preclude coverage, and the subcontractor exception to that exclusion would not reinstate coverage.

## IV

¶ 67. Because the property damage suffered by the Stuarts arose out of the volitional misrepresentations of WSGI, and because the CGL policy issued by American Family contains a business risk exclusion applicable to this case, we conclude that the policy does not cover the damages award to the Stuarts in this action. Consequently, we reverse the court of appeals' ruling that coverage applies under the policy, and remand this matter for further proceedings consistent with this opinion and with *Stuart I.*

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the circuit court for further proceedings consistent with this opinion and with *Stuart I.*

¶ 68. ANN WALSH BRADLEY, J. (*concurring*). I agree with the majority that the misrepresentations in

this case were not occurrences within the meaning of the American Family CGL policy. Majority op., ¶ 4. Accordingly, I agree that the policy here does not provide coverage. *Id.* Likewise, I agree that the property damage falls under the "your work" exclusion of the policy. *Id.,* ¶ 64. I also agree with the majority that the holding today does not address the question of whether an "occurrence" could involve an accidental misrepresentation in a future case. *Id.,* ¶ 46 n. 17. I therefore join the majority opinion.

¶ 69. I write separately, however, to address the discussion in section III A of the majority opinion and to respond to the concurrence of Justice Roggensack.

¶ 70. The majority concludes in its discussion in section III A that "misrepresentations volitionally made" cannot constitute an occurrence within the meaning of a CGL policy. *Id.,* ¶ 45. To the extent that the discussion in III A stands for the proposition that a volitional misrepresentation is synonymous with an intentional misrepresentation, and that damages resulting from volitional (i.e., intentional) misrepresentations are not covered by the CGL policy here, I am in complete accord.

¶ 71. To the extent that the discussion set forth in ¶¶ 39–44 of section III A suggests otherwise, I would not join that part of the discussion. I believe that "accident" should be construed as understood by the reasonable insured and, following the majority of jurisdictions, the determination should be based on whether the injury or damages are unexpected and unintentional.[1]

---

[1] This court's longstanding doctrine in interpreting insurance policies is that language in an insurance policy should be construed as understood by a reasonable person in the position of the insured. *Frost v. Whitbeck,* 2002 WI 129, ¶ 20, 257 Wis. 2d 80, 654 N.W.2d 225. A reasonable insured would understand

¶ 72. I turn next to address the interpretation of accident in Justice Roggensack's concurrence. The concurrence argues that the majority misreads *Everson v. Lorenz,* 2005 WI 51, 280 Wis. 2d 1, 695 N.W.2d 298. It attacks the majority's interpretation of the conclusion in *Everson:* "[I]n interpreting *Everson,* the majority asserts that we concluded that a false assertion requires a degree of volition inconsistent with the term accident." Justice Roggensack's concurrence, ¶ 99 (internal quotes and cites omitted).

¶ 73. The concurrence advances that the majority misapprehends what was intended by *Everson. Id.* It takes the majority to task for concluding that "under *Everson* it is only the false assertion that must be volitional." *Id.*

¶ 74. I submit that it is the majority that correctly interprets *Everson* and that it is the concurrence that misapprehends *Everson's* intent. The concurrence appears to interpret *Everson* as determining that any time there is a volitional act involved in causing damages—including the mere act of speaking—no accident has occurred.[2] *Id.*

---

"accident" to include injury or damages caused by negligent actions, even where some action down the line was intended.

The relevant event or incident should be the injury or damages. The approach focusing on injury or damages rather than whether there is some intentional act involved somewhere down the line is the approach in the majority of jurisdictions. *See* J.P. Luddington, *Liability Insurance: "Accident" or "Accidental" as Including Loss Resulting From Ordinary Negligence of Insured or His Agent,* 7 A.L.R.3d 1262 (1966)(updated 2008); 2 Allan D. Windt, *Insurance Claims and Disputes, § 11.3 (5th ed. 2007).* It has also been this court's longstanding approach.

[2] In the context of negligent misrepresentation, the presence of a volitional act by itself does not preclude an action from

¶ 75. By implying that accidents involve only circumstances in which there are no volitional acts of any sort, the concurrence appears to not only misinterpret *Everson,* but also contradicts our prior cases. In *Doyle v. Engelke,* 219 Wis. 2d 277, 580 N.W.2d 245 (1998), the plaintiff alleged that the insured had negligently supervised two of its employees. She argued that the employees had intentionally filed a false security agreement that encumbered Doyle's assets and served a false subpoena at her residence, causing emotional injury to Doyle. *Id.* at 282.

¶ 76. The employer carried an insurance policy that covered an "event," and which defined "event" as the CGL policy in this case defines "occurrence," that is, as an accident. *Id.* at 289. We determined that there was coverage because a reasonable insured would expect negligent acts, including the negligent supervision of employees' intentional acts, to constitute accidents. Accordingly, we concluded the policy covered the allegations in the case as an accident, and therefore as an event. *Id.* at 290.

¶ 77. The concurrence's analysis would appear to preclude coverage in *Doyle.* We were explicit that the employees' acts were intentional. Nonetheless, it was an

---

being an accident. *See* H. Brent Brennenstuhl, *Negligent Misrepresentation as "Accident" or "Occurrence" Warranting Insurance Coverage,* 58 A.L.R.5th 483 (1998). Courts have generally determined whether negligent misrepresentation may be an accident for the purposes of insurance coverage based upon whether the insured intended to make a misrepresentation, *id.,* § 3[a], whether the insured intended to cause injury, *id.,* § 3[b], or whether the injury was foreseeable, *id.,* §§ 3[c] and 4[c]. Those jurisdictions considering intent to induce reliance as precluding negligent misrepresentation from being an accident have generally done so on the basis that misrepresentation claims are akin to fraud. *Id.,* §§ 4[a] and 4[b].

accident covered under the policy because the harm to Doyle was "an unexpected, undesirable event or an unforeseen incident . . . characterized by a lack of intention." *Id.* at 289 (internal quotations and citations omitted).

¶ 78. The concurrence's view would also appear to conflict with *Westfield Ins. Co. v. J.C. Penney Corp., Inc.,* in which a federal court interpreted Wisconsin law in addressing whether there was an accident for the purpose of insurance coverage. 458 F. Supp. 2d 953 (W.D. Wis., 2006). *Westfield* involved allegations that the negligent design and manufacture of a lamp and lamp cord were substantial factors in causing a fire. *Id.* at 956–57. Although the Western District of Wisconsin determined that there was an accident for the purposes of insurance coverage, it would seem that designing and manufacturing products are volitional acts, and were a cause of the damage. Would the concurrence's view preclude coverage in that case?

¶ 79. Similarly, the test set forth for determining whether there is an accident may conflict with *Kalchthaler v. Keller Const. Co.,* 224 Wis. 2d 387, 591 N.W.2d 169 (Ct. App. 1999). That case involved damage to a building caused by negligent construction. *Id.* at 392 n.2. The court of appeals determined that the damage was an accident for the purposes of insurance coverage. *Id.* at 397. Was the cause of the damage intentional insofar as the construction was intended? Does the interpretation of accident in the concurrence suggest that the *Kalchthaler* court erred?

¶ 80. I agree with the majority's conclusion that there is no accident here. As I see it, this is not a case of negligence. Rather, it is a case in which the misrepresentation was intended.

¶ 81. Accordingly, I respectfully concur.

¶ 82. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON joins this concurrence.

¶ 83. PATIENCE DRAKE ROGGENSACK, J. (*concurring*). I join only the majority opinion's conclusion that American Family Mutual Insurance Company's (American Family) policy does not provide coverage for the misrepresentations[1] and the negligent construction that the jury found. I write separately because: (1) the

---

[1] As I explained in my concurrence/dissent in *Stuart v. Weisflog's Showroom Gallery, Inc.*, 2008 WI 22, 308 Wis. 2d 103, 746 N.W.2d 762 (*Stuart I*), the findings of the jury are not sufficient to sustain an actionable claim for misrepresentation because the jury found only promises of future performance, not representations of facts then in existence. *Id.*, ¶¶ 69–73 (Roggensack, J., concurring in part and dissenting in part); *see also Consol. Papers, Inc. v. Dorr-Oliver, Inc.*, 153 Wis. 2d 589, 594, 451 N.W.2d 456 (Ct. App. 1989) (concluding that Dorr-Oliver's representation that the clarifier it promised to construct would meet the specific operating requirements of Consolidated Papers was not actionable as a misrepresentation, even though the clarifier that was built did not comply with Consolidated Papers' specific operating requirements). Representations that are promises of future performance are not actionable as misrepresentations, unless the person promising future performance had no intention of carrying out that promise at the time he made the promise. *Consol. Papers*, 153 Wis. 2d at 594.

Because the majority opinion in *Stuart I* chose not to address the issue of whether a promise of future performance is actionable as a misrepresentation and simply assumed that it was actionable, that issue is not before the court in regard to the coverage questions relating to the American Family CGL policy for the same conduct as *Stuart I* addressed. Therefore, I do not address it further in this opinion, except to note that the Stuarts' own argument in regard to coverage at once refutes their claim for misrepresentation and supports my view of the law.

This is so because the Stuarts argue in this review that "Weisflog's Showroom's representations became false after poor

532

majority opinion appears to misread *Everson v. Lorenz,* 2005 WI 51, 280 Wis. 2d 1, 695 N.W.2d 298; (2) the majority opinion employs disputed facts that the jury did not find in order to support its reasoning; and (3) the claim for coverage due to Weisflog's Showroom Gallery, Inc.'s (Weisflog's Showroom) negligent construction of the addition to Robert Stuart and Lynn Farquhar-Stuart's (the Stuarts) residence is barred by the economic loss doctrine. Accordingly, although I respectfully concur, I join none of the majority opinion except its ultimate conclusion that the American Family policy provides no coverage for the claims on which the Stuarts prevailed before the jury.

## I. BACKGROUND

¶ 84. This lawsuit arises from the design and construction of an addition to the home of the Stuarts. It is the second decision of this court relative to the construction of the Stuarts' addition, the first being *Stuart v. Weisflog's Showroom Gallery, Inc.,* 2008 WI 22, 308 Wis. 2d 103, 746 N.W.2d 762 (Stuart I), to which I filed a separate opinion, concurring in part and dissenting in part.

---

design and construction." The majority opinion recognizes that the Stuarts have changed their tune in this review, and it refuses to permit them to do so by stating the majority opinion's view of what "the record shows." Majority op., ¶ 42. A representation, of course, cannot *ripen* into an actionable misrepresentation at a later date, if promises are not kept. *See Consol. Papers,* 153 Wis. 2d at 594.

Failure to keep a promise of future performance is actionable as a breach of contract. *Eli Envtl. Contractors, Inc. v. 435 Partners, LLC,* 2007 WI App 119, ¶ 6, 300 Wis. 2d 712, 731 N.W.2d 354. Accordingly, I continue to stand by my separate opinion in *Stuart I* as a correct statement of the law of actionable misrepresentation.

¶ 85. The Stuarts wanted to enlarge their home. To this end, they entered into a written contract entitled, "Remodeling Architectural Contract" wherein plans were drawn by Weisflog's Showroom for an addition that would double the size of their home and provide an in-ground swimming pool with surrounding deck. The total cost of the plans produced for the Stuarts under the Remodeling Architectural Contract was $1,500.

¶ 86. Five months after entering into the Remodeling Architectural Contract, the Stuarts entered into a second contract with Weisflog's Showroom[2] entitled, "Remodeling Contract," in the amount of $278,076.96, to construct their home improvements.

¶ 87. Approximately four years after the construction was completed, the Stuarts commenced this action alleging negligence in the design and construction of their home addition and breach of contract. They later amended the complaint to allege that they were damaged because of Home Improvement Protection Act (HIPA) violations under Wis. Stat. § 100.20(5) and Wis. Admin. Code § ATCP 110.02(11), based on alleged misrepresentations that induced them to enter into the two contracts. However, before trial, the Stuarts dismissed their breach of contract claims and proceeded on claimed HIPA violations, based on alleged misrepresentations with regard to both contracts,[3] and on claims of common law negligence in the design and construction of the addition.

---

[2] In answering Special Verdict Question No. 9, the jury found that the Remodeling Contract was a contract between the Stuarts and Weisflog's Showroom.

[3] Although it has no effect on the coverage question presented by the case at hand, I note that the Remodeling Architectural Contract, under which the plans for the addition were drawn, may not be a "home improvement contract" as that

¶ 88. The jury was the fact finder for the Stuarts' claims. It found false, deceptive or misleading representations[4] were made to induce the Stuarts to enter into both contracts. The jury found common law negligence in regard to the design and construction of the addition. Because the jury was the fact finder, the Special Verdict answers are critical to a correct application of the relevant law. In this case, we are asked to interpret the Commercial General Liability (CGL) policy that Ameri-

term is defined in HIPA. Wis. Admin. Code § ATCP 110.01(4) (Oct. 2004) defines a "home improvement contract" as an agreement "to perform labor or render services for home improvements, or furnish materials in connection therewith." Section ATCP 110.01(2) defines "home improvement" as "the remodeling, altering, repairing, painting, or modernizing of residential or non-commercial property, or the making of additions thereto . . ." Nothing in the Architectural Remodeling Contract provides that Weisflog's Showroom will construct the addition to the Stuarts' home. Robert Stuart testified that he believed he owned the plans produced under that contract and could take them to any builder he chose. The contract wherein Weisflog's Showroom agreed to perform "home improvements" is the Remodeling Contract.

[4] Special Verdict Questions 1 and 13 addressed the Stuarts' misrepresentation claims. They provided:

1. Did Weisflog's Showroom Gallery, Inc., make any false, deceptive, or misleading representations in order to induce the Plaintiffs, Robert & Lin Stuart to enter into a remodeling architecture contract, or to obtain or keep any payment under the remodeling architecture contract?

ANSWER: Yes.

13. Did the remodeling contractor or its agents make false, deceptive or misleading representations that remodeling work will comply with the building codes in order to induce the Plaintiffs Robert and Lin Stuart to enter the remodeling contract?

ANSWER: Yes.

can Family provided to Weisflog's Showroom to decide whether coverage exists thereunder, in light of the findings of the jury.

## II. DISCUSSION

### A. Standard of Review

¶ 89. Resolution of the issues that I will address are questions of law, wherein we provide independent review, "but benefiting from the analyses of the court of appeals and the circuit court." *Marder v. Bd. of Regents of the Univ. of Wis. Sys.*, 2005 WI 159, ¶ 19, 286 Wis. 2d 252, 706 N.W.2d 110. The interpretation of an insurance contract is a question of law. *Katze v. Randolph & Scott Mut. Fire Ins. Co.*, 116 Wis. 2d 206, 212, 341 N.W.2d 689 (1984). Whether the economic loss doctrine applies either to a particular type of claim or to a particular fact set presents a question of law. *See Kaloti Enters., Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶ 10, 283 Wis. 2d 555, 699 N.W.2d 205; *Kailin v. Armstrong*, 2002 WI App 70, ¶ 43, 252 Wis. 2d 676, 643 N.W.2d 132.

### B. Insurance Coverage

#### 1. The misrepresentation verdicts' effect on coverage

¶ 90. The Stuarts contend that they suffered property damage due to Weisflog's Showroom's representations that caused them to enter into the Remodeling Architectural Contract and the Remodeling Contract. The parties do not dispute that it is necessary to show that the property damage was caused by an "occurrence," in order to come within the American Family CGL policy. "Occurrence" is defined in the policy.

536

Accordingly, we must determine whether the representations that the jury found were false, deceptive or misleading are "occurrences" under the policy.

¶ 91. We interpret the language of an insurance policy as "a reasonable person in the position of the insured would have understood the words." *Kremers-Urban Co. v. Am. Employers Ins. Co.,* 119 Wis. 2d 722, 735, 351 N.W.2d 156 (1984). In regard to property damage, the policy provides:

COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. Insuring Agreement.

. . . .

b. This insurance applies to "bodily injury" and "property damage" only if:

(1) the "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

(2) the "bodily injury" or "property damage" occurs during the policy period.

"Occurrence" is defined in the policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Therefore, the policy requires that the property damage be caused by an accident in order for damages to be covered by the policy. It follows that, in order for the property damage the Stuarts claim the HIPA-misrepresentations caused to fall within the policy, the defendants' statements must be accidents.

¶ 92. We have reviewed insurance policies' definitions of "accident" in a number of cases. We recently considered the meaning of "accident" in a case involving

an insurance policy that defined that term identically to how it is defined in the American Family CGL policy. We did so in the context of a coverage claim for property damage that was allegedly caused by a misrepresentation. *Everson,* 280 Wis. 2d 1, ¶¶ 15–16.

¶ 93. Everson sued Lorenz based on theories of intentional, negligent and strict liability for misrepresentation due to a typographical error in a real estate condition report that Lorenz, the seller of the real estate, gave to Everson, the buyer. *Id.,* ¶¶ 4–5. The condition report disclosed that portions of 16 of the lots that Lorenz was selling came within the 100–year floodplain. *Id.* However, it failed to list the lot that Everson purchased, even though portions of it also came within the 100–year floodplain. *Id.,* ¶ 5. When Everson discovered that a portion of his lot lay within the 100–year floodplain, he sued Lorenz, claiming that he could not build his home in the location that he desired due to Lorenz's misrepresentation. *Id.*

¶ 94. Lorenz tendered the defense of Everson's suit for property damage to his CGL insurer. *Id.,* ¶ 6. We opined that coverage for property damage under Lorenz's CGL policy was dependent on whether the property damage was caused by an "occurrence." *Id.,* ¶ 15. Lorenz's CGL policy defined "occurrence" as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.*

¶ 95. Lorenz argued that a typographical error caused the omission of the lot Everson purchased from the list of 16 lots shown on the condition report as lying partially in the 100–year floodplain. Therefore, Lorenz argued the failure to disclose the true condition of the lot he sold to Everson was an "accident." *Id.,* ¶ 16.

¶ 96. We disagreed. We explained that while the condition report may have accidentally misrepresented

the condition of the lot, the giving of the condition report to Everson was a "volitional act." *Id.*, ¶¶ 19–21. We held that volitional acts are not accidents. *Id.*, ¶ 22. As we explained, "What happened here, stripped to its essentials, is that an 'action,' not an 'accident,' of Lorenz gave Everson the misleading information. . . . [T]he decision to give Everson the report is not an 'accident' within the meaning of the policy." *Id.* (citations omitted).

¶ 97. *Everson* is on all fours with the case before us. First, the policy definition of "accident" is the same in *Everson* as it is in the American Family CGL policy under review here. Second, the context here is similar to that in *Everson,* i.e., the Stuarts claim property damage caused by representations that the defendants made. Third, the defendants chose to promise the Stuarts that Weisflog's Showroom will design plans and construct an addition to the Stuarts' home that will comply with the building codes. The defendants' statements were part of the sales pitch to do business with the Stuarts, just as Lorenz's giving of the real estate condition report to Everson was part of Lorenz's sales pitch. Therefore, I conclude that the defendants' statements are volitional acts and not accidents within the meaning of the American Family CGL policy. Since the defendants' statements are not accidents, they cannot be occurrences under the CGL policy. Accordingly, I conclude that there is no coverage under the American Family CGL policy for the misrepresentations that the jury found.

¶ 98. The majority opinion employs a somewhat different interpretation of *Everson.* It relates:

> With the jury having found the presence of such volition and intent, in accordance with the requirements of

539

the code, the only reasonable conclusion regarding WSGI's [Weisflog's Showroom Gallery, Inc.] conduct "in order to induce" is that such conduct cannot qualify as an accidental, i.e., unintentional, occurrence. . . .

In support of this conclusion, we turn to *Everson* . . . .[5]

¶ 99. It appears to me that the majority opinion misreads *Everson* and confuses *Everson*'s discussion of "volitional act" by adding an intent to deceive to the volitional act.[6] *Everson* did not address whether Lorenz knew the information he gave Everson was false. *Everson* focused on whether Lorenz gave Everson a real estate condition report that had a typo on it. *Everson*, 280 Wis. 2d 1, ¶ 22. We concluded that when Lorenz gave Everson the report, Lorenz's act was volitional because he intended to give Everson a copy of the report. *Id.* There is nothing in *Everson* that implies the court concluded Lorenz knew the report was inaccurate or intended to deceive Everson. However, in interpreting *Everson,* the majority asserts that "we concluded that a false assertion 'requires a degree of volition inconsistent with the term accident.' "[7] The majority's reading of Everson misapprehends what must be volitional to be deemed nonaccidental. The majority appears to conclude that, under *Everson,* it is only the false assertion that must be volitional. The majority is mistaken. The volitional act in *Everson* was not Lorenz's assertion, but rather, Lorenz's giving to Ever-

---

[5] Majority op., ¶¶ 28–29.

[6] The majority opinion asserts that "Ronald Weisflog knew at the time of the misrepresentations that he was not familiar with an applicable building code." *Id.*, ¶ 31.

[7] *Id.*, ¶ 32.

540

son the written condition report, regardless of the veracity of the report's content. *Id.*

¶ 100. Furthermore, we are not free on this review to add questions and answers to the Special Verdict. Nor are we free to support our reasoning in an opinion by inserting facts that were disputed, but which the jury did not find. The majority opinion finds facts throughout the opinion.

¶ 101. The jury made two specific findings in regard to the defendants' representations. In answering question number 13, the jury found representations were made that the addition "will comply" with the building codes. In answering question 4, the jury found the defendants *did not* represent that they were licensed architects. The jury did not find that Ronald Weisflog did not understand the Brookfield codes and regulations; yet that is the impression the majority opinion gives.

¶ 102. For example, the majority opinion quotes Robert Stuart's statement that Ronald Weisflog told him that he "professed a very high standard of quality . . . . He understood Brookfield codes and regulations very well. . . . He could provide architectural service for us."[8] The majority opinion then says, "Ronald Weisflog knew at the time of the misrepresentations that he was not familiar with an applicable building code."[9] The jury did not find that Ronald Weisflog was not familiar with the building codes when he said that he would construct the addition in compliance with them. Ronald Weisflog repeatedly asserted that he was familiar with the relevant codes. However, the majority opinion supports some of its conclusions by

[8] *Id.*, ¶ 41.
[9] *Id.*, ¶ 31.

finding facts, which we are not permitted to do on this review. *See Wurtz v. Fleischman,* 97 Wis. 2d 100, 108, 293 N.W.2d 155 (1980).[10]

¶ 103. The majority opinion attempts to put aside my objection in this regard by citing *Coney v. Milwaukee & Suburban Transport Corp.,* 8 Wis. 2d 520, 99 N.W.2d 713 (1959) and asserting, "we may refer to whatever facts in the record support the jury's findings."[11] *Coney* does not apply because *Coney* is a sufficiency of the evidence opinion where the jury's findings were challenged. When a claim is made that the evidence is not sufficient to support a jury's verdict, we do consider the record to determine whether there is credible evidence to support that verdict. *D'Huyvetter v. A.O. Smith Harvestore Prods.,* 164 Wis. 2d 306, 320, 475 N.W.2d 587 (Ct. App. 1991). However, the majority opinion is not evaluating the sufficiency of the evidence in this case. It is using portions of the trial transcript to support findings it chooses to make, not to support findings that the jury made.

¶ 104. By contrast with the majority opinion herein, the record cites I employed in my dissent in *Stuart I* relative to the jury's apportionment of damages (*Stuart I,* 308 Wis. 2d 103, ¶ 45) were necessary because the majority opinion concluded that the evidence was not sufficient to support the jury's verdict on damages. *Stuart I,* 308 Wis. 2d 103, ¶ 31. As many cases have explained, upon a challenge to the jury's verdict based on the sufficiency of the evidence, we

---

[10] Other portions of the majority opinion make similar factual findings. I have chosen not to detail all of them here, except to repeat that we are bound by the jury's findings. *See id.,* ¶¶ 9 n.10, 41–42.

[11] *Id.,* ¶ 9 n.10.

must review the record to determine if there is credible evidence to support the verdict. *Coryell v. Conn,* 88 Wis. 2d 310, 315, 276 N.W.2d 723 (1979) (reviewing whether the record contains credible evidence that supports the jury's damages award). That is what I have done in reviewing the evidence of damages in *Stuart I.*

2. Economic loss doctrine

¶ 105. The Stuarts also assert that there is coverage under the CGL policy for property damage they sustained due to Weisflog's Showroom's negligent construction of the addition to their home.[12] The majority addresses this contention by interpreting other provisions of the CGL policy.[13] I address it under the economic loss doctrine because I conclude that the Stuarts' negligent construction claim is precluded by the economic loss doctrine. Therefore, there are no damages that can be awarded for negligent construction and no coverage is needed.

a. General principles

¶ 106. The economic loss doctrine is a common law doctrine created by the courts to recognize that contract law and the law of warranty are better suited than tort law to deal with purely economic loss between two contracting parties. *Kaloti,* 283 Wis. 2d 555, ¶ 28.

---

[12] This position is inconsistent with the Stuart's position before this court in *Stuart I* where they maintained that all of their damages arose out of Weisflog Showroom's representations. They apparently took this position because they sought to double their damages under HIPA provisions that proscribe false, deceptive or misleading representations. *See Stuart I,* 308 Wis. 2d 103, ¶¶ 27–28.

[13] Majority op., ¶¶ 56–66.

We have defined "economic loss" as "damages resulting from inadequate value because the product is inferior and does not work for the general purposes for which it was manufactured and sold." *Id.*, ¶ 29 (quoting *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis. 2d 395, 400–01, 573 N.W.2d 842 (1998)). Economic damages include damages to the product itself and to other components in an integrated system. *Wausau Tile, Inc. v. County Concrete Corp.*, 226 Wis. 2d 235, 249–50, 593 N.W.2d 445 (1999). We have applied it to the construction of residential real estate, *Linden v. Cascade Stone Co.*, 2005 WI 113, 283 Wis. 2d 606, 699 N.W.2d 189, and to remodeling contracts, *1325 North Van Buren, LLC v. T-3 Group, Ltd.*, 2006 WI 94, 293 Wis. 2d 410, 716 N.W.2d 822. However, contracts for services, where a product is merely incidental, do not fall within the scope of the economic loss doctrine. *Ins. Co. of N. Am. v. Cease Elec., Inc.*, 2004 WI 139, ¶ 36, 276 Wis. 2d 361, 688 N.W.2d 462. When a contract is mixed, including both services and the creation of a product, we must determine the predominant purpose of the contract before we may conclude whether the economic loss doctrine applies. *Linden*, 283 Wis. 2d 606, ¶ 22.

¶ 107. In order to determine whether the economic loss doctrine applies to preclude common law claims for negligence between contracting parties where both a product and services are provided, a court must determine whether the predominant purpose of the contract is to provide a product or to provide services. *1325 N. Van Buren*, 293 Wis. 2d 410, ¶ 24; *Linden*, 283 Wis. 2d 606, ¶¶ 18–22. We employ a totality of the circumstances test to determine the predominant purpose of a contract. *Linden*, 283 Wis. 2d 606, ¶ 22. The totality of circumstances includes both subjective and objective factors. *Id.* Those factors include,

but are not limited to, the primary objective the contracting parties entered into the contract to achieve, the requirements of the contract, the nature of the business of the party doing work under the contract, and the value of the materials used. *1325 N. Van Buren,* 293 Wis. 2d 410, ¶ 42.

¶ 108. The Stuarts entered into two separate contracts with Weisflog's Showroom, and the jury found Weisflog's Showroom was negligent in the design and in the construction of the addition.[14] However, the jury awarded no damages for negligent design; it awarded damages only for negligent construction.[15] The parties contracted to construct the addition to the Stuarts' home in the Remodeling Contract.

b. The Remodeling Contract

¶ 109. The Remodeling Contract indisputably involved: (1) the creation of a product, the addition, and (2) services, the construction labor. Therefore, I review the totality of the circumstances to determine the predominant purpose of this contract.

¶ 110. First, the addition constructed included many facets: a new hot tub room; a new, expanded kitchen; a new, expanded master bedroom suite; a powder room and entry change; an add-on to the garage with a mudroom, bath and family room; and an outdoor in-ground swimming pool and surrounding deck. Accordingly, a product was created. Second, the Stuarts' primary objective in entering into the Remodeling Contract was to nearly double the size of their home and significantly upgrade its amenities. The Stuarts sought a product. Third, the "remodeling contractor,"

---

[14] See Special Verdict Questions No. 7 and 11.

[15] See Special Verdict Question No. 16B.

Weisflog's Showroom, was in the business of creating products: remodeled residential properties. Fourth, the addition's cost to the Stuarts was $278,076.96. This cost included materials and the labor necessary to create a 2,000 square foot addition and an in-ground swimming pool. The Remodeling Contract stated that the "Contract amount is based upon bid sheet." Any changes in the specifications bid upon that raised or lowered the cost of the addition would be charged or credited to the Stuarts. Therefore, the parties bargained for the price of a product based on the addition's specifications, not on the hours of labor it took to complete the addition.

¶ 111. I conclude that under the totality of the circumstances presented, the Stuarts contracted for much more than services with materials being merely incidental, in contrast with the circumstances in *Cease Electric*. The Remodeling Contract had as its predominant purpose the creation of a product, the Stuarts' home addition. Accordingly, it falls squarely within the economic loss doctrine's proscription that the Stuarts may not maintain tort claims for the failure to complete the addition's construction in a workmanlike manner. Their claims sound in contract, not in tort. *Linden*, 283 Wis. 2d 606, ¶ 22.

¶ 112. My analysis of the Remodeling Contract for the Stuarts' home follows the analysis we employed in *1325 North Van Buren*. There, we applied the totality of circumstances test to the remodeling of a warehouse and concluded that the parties bargained to produce a product: 42 residential condominiums and adjacent parking garages. *1325 N. Van Buren*, 293 Wis. 2d 410, ¶ 46. My conclusion here is consistent with *1325 North Van Buren* and with *Linden*. Accordingly, in compliance with that precedent, I conclude that the predominant

purpose of the Remodeling Contract is to produce a product: the 2,000 square foot addition and the inground swimming pool with surrounding deck. Therefore, I also conclude that the Stuarts' claim for negligent construction should be dismissed, and the $71,250[16] in damages awarded by the jury for that claim should be vacated. The economic loss doctrine precludes damages for negligent construction; therefore, no insurance coverage for those damages is needed.

## III. CONCLUSION

¶ 113. Although I respectfully concur, I join none of the majority opinion except its ultimate conclusion that the American Family policy provides no coverage for the claims on which the Stuarts prevailed before the jury.

¶ 114. I am authorized to state that Justice ANNETTE KINGSLAND ZIEGLER joins this concurrence.

---

[16] The jury found total damages of $95,000 and that 75% ($71,250) of those damaged were caused by negligent construction of the addition.